The Honorable, the Judges of the United States Court of Appeals for the 8th Circuit. Hear ye, hear ye, hear ye. United States Court of Appeals for the 8th Circuit is now in session. All persons having business before this Honorable Court may now draw near, and they will be heard. God save the United States and this Honorable Court. Welcome, and please be seated. As you announce the cases for submission this morning, please. The following cases are scheduled for oral argument this morning, Tuesday, June 12, 2018. No. 17-2152, Southern District of Iowa, Sheena Lipp v. Cargill Meat Solutions Corp. No. 17-2290, District of Minnesota, Chartered Advanced Services, et al. v. Nancy Lang, et al. No. 17-3055, Southern District of Iowa, Rigoberto Quinez v. Allen Johnson. And No. 17-2926, District of Minnesota, EEOC v. North Illinois Health Care. In addition, the following cases will be submitted on the briefs without oral argument. Case No. 17-2963, District of Minnesota, Janice Hussvedt v. Alina Health System. The first case for argument this morning is Sheena Lipp v. Cargill. Thank you. Mr. Lyons? May it please the Court. Mr. Clark. Good morning. My name is Aaron Lyons. I am the attorney for Sheena Lipp, the plaintiff and the appellant in this case, and we are here to argue that the summary judgment entered against Ms. Lipp should be reversed. She was a qualified person with a disability. She can demonstrate that the proffered reason for her termination was a pretext for discrimination, and she can show that she was overall fired because of her disability. And with the Court's permission, I'll address each of those points in turn. First, Ms. Lipp was a qualified person with a disability. She had an incurable lung disease that caused her to experience coughing and shortness of breath during unpredictable flare-ups and have trouble with physical exertions during those periods. The only dispute about Ms. Lipp's qualifications to hold her job is the regular and reliable attendance issue. In that regard, your brief states repeatedly that Ms. Lipp was never going to be able to abide by the last chance agreement. Is that an admission that she was not able to perform the essential functions of the job? It is not. She was never going to be able to abide by the very strict terms of this last chance agreement that required her not to have any more, in particular, call-ins. As far as arranging for her regular testing appointments, that was perfectly fine. But the lung disease that she had made it impossible for her to know whether or not she was going to have a flare-up. She was just going to have to be able to call in. Her doctor, Dr. Berger, stated that that would happen two to four times per year. She had these restrictions from at least October 24th of 2012, so long before her termination. These were restrictions of long-standing by the time of her termination. Now you've gotten into a fact question that I have that I don't think either party addresses clearly in the briefs. That is, prior to January 2014, where is the evidence that, supporting your assertion, your repeated assertion, that you got points under the policy even if you had a doctor's note? I'll start out by saying that she was accommodated for two years, which jibes with this October 2012, let's say a year and a quarter at least. That means she was, and it seems to be undisputed, that she was given time off for both flare-ups and medical appointments. But I find nothing in the record confirming that she got no points as well as time off with pay. Where in the record is a listing of the flare-up time off and the medical appointment times off starting in October 2012 and running to January 2014 with a recitation whether she did or did not have time off with pay, did or did not get points under the policy, did or did not have a medical note, did or did not give advance notice. That's simply not in the record. It may be in the record, but it's not in the briefs. And, Judge, the particular listing that you are looking for is actually not in the summary judgment record at all. Now, who loses if that's important? The Apelli-Cargill Meat Solutions. I don't think so. At all times, they have been arguing that she does not get a point when she returns to work with a doctor's note. But that's not what their policy says, and it's not what their... The policy couldn't be more ambiguous. I've read it. I read it closely. On this point, it's completely ambiguous. So this is a matter for proof. And it seems to me it's your assertion, and therefore it's your proof. Now, where is it supporting that when your client testifies, oh, yeah, they accommodated me, they gave me time off, is not asked and does not volunteer about the points question, which doesn't come up for a year or more later, you haven't established what seems to be an essential assertion in your opposition to summary judgment. When I spoke with their Federal Rule of Civil Procedure 30B-6 corporate representatives, I confirmed this with their witness, Ms. Perryman. I read your book. I didn't read the deposition. I read your quotes in your brief. It doesn't solve this problem. It doesn't clarify this at all. It seems to me if all she had assessed were the points that were retroactively assigned when she came back from the nine-month unrelated leave of absence, that to me suggests strongly that she wasn't assigned points for all these flare-ups in 2013 and late 2012, or she would have had more points. If every medical appointment and flare-up from October 2012 until January 2014 had earned her points despite time off with pay, then 194 would have understated the points, right? Well, I'm not sure that's right. I'm not sure, but why not? How many flare-ups in 2013? That's not in the summary judgment record, Judge. Do you have any indication how many points were assigned for flare-ups or doctor's appointments, if any? The only thing that's in the summary judgment record that would address that question was when she returned to work on October 15th of 2014, she was given these retroactive points. And I believe they started at six points, which suggests that she already had a pre-existing five points. Yeah, five points, but she had a 2006 disciplinary, right? This was not an employee who never got points until she incurred the disability. So five points doesn't sound... From your brief's description of how many flare-ups and how many medical appointments she had to have under these doctor's work restrictions, she'd have had more than five points. I'm not sure that that's correct, Judge, and let me tell you why. If she got this restriction in October of 2012 and worked through the year of 2013 and started incurring absences because of caring for her mother in January of 2014, then she was gone for a year and a quarter. If she had had four absences in 2013 because of flare-ups and maybe one in 2012, at the end of 2012... ...number of medical appointments, from your description of her ongoing relationship with Dr. Berger... And there's nothing in the summary judgment record that says one way or the other when she was having doctor's appointments and when she accumulated points. ...or an assertion under oath by your client that were flare-ups in 2013, and even though she was given time off with pay, she was assessed points under the policy. Nothing from 2012 or 2013 addresses that one way or the other, Judge. It seems to me that the negative inference that it wasn't a fact is rather compelling. The folks who move for summary judgment who rely on this argument that, with doctor's notes... They're not relying on it. This is your defense to their argument of undisputed bad absence in November and late October of 2014. The parties are agreed that the language of the policy is what the policy language is, and if someone returns with a doctor's note, all that does is make a multi-day absence into one absence occurrence. The assertion at the start of your brief is that she was accommodated. That would tell me that even if the ambiguous policy could be read as what you're now saying for litigation purposes, if she was accommodated, that would not have been the case. She would have been accommodated by permitting her to come back with a doctor's note after an unplanned flare-up absence without adverse employment action. And the parties have not disputed whether or not there's a... It's undisputed that she was accommodated until January 2014, right? That's right. She has no complaints with regard to their treatment of the situation. That tells me that she was not adversely affected by the assessment of points for unplanned flare-up absences which were excused by a doctor's note when she returned as opposed to before she took the leave. I think that's possible, but I don't think it's determined on the basis of the record. If she had the five points from 2012 and 2013, then it's possible that when she returned with a doctor's note, she was assigned an attendance point. It's certainly undisputed that when she returned to work after the October 30, 2014 absence, she informed her employer that she was gone because of a flare-up of her disability and she was nevertheless fired at that point. You say it's undisputed. Your reply where you said it's undisputed that it was her disability that caused what she described initially as a vacation timeout on October 30, 2014. Until she comes to the termination meeting on November 4, she hasn't whispered to the employer that this was a flare-up incident, has she? Judge, I don't believe there's... Is that right or not? Say yes or no and then explain why it's not a pertinent question. I think it's not right because... Who did she tell and how and when? She called in to report her absence. There is no competent evidence in the record that I know of that she actually reported her absence as being a vacation absence as opposed to a call-in sick. The folks who make that statement are the 30B6 witness, Karen Richards. Now there we get to the hearsay claim which opposing counsel says was first raised on appeal. Where is the evidentiary debate in the district court about whether the witnesses for Cargill who said that she's called it a vacation when she called in may not testify to that? Ms. Lipp has stated in her affidavit as well as in her deposition that she had no intent to... Wait, wait, wait. I thought she testified that, well, okay, I might have said that. But it wasn't right. And now all of a sudden on appeal, oh, well, you can't consider Cargill's evidence that she reported in as vacation because it's hearsay. And that's an issue that has to be raised in the district court because it's very controversial for summary judgment purposes. So where was it raised? Where is the dialogue with the district court about whether that can be considered for summary judgment purposes? We did raise the point about the weakness of the evidence in our briefing. Are you clear with the summary judgment case law about whether hearsay that may or may not be admissible at trial can be considered for summary judgment purposes? It can be if it's... Yes, that's controversial though. If you don't want it to be, you've got to raise it in the district court. Right. They have to... Did you raise that hearsay issue in the district court? I don't know that we raised it in terms of a hearsay or a no competent evidence. I think we did say, however, that there was weak evidence on that record. The argument is foreclosed. It's not because it's first raised on appeal. It's worse than that. It's foreclosed. I don't think that it gets in the way though of us showing that there is a genuine issue of material fact. We have one set of folks saying one thing. We have one set of folks saying, I don't think I did. She says she didn't say vacation in the call-in. She's saying that she had no intent to do it and that she doesn't think she did it, but just as someone when they pick up the phone... She concedes that it's within the realm of possibility, just like when you pick up the phone and you intend to dial a number, maybe you dial the wrong number. She's going to say that she had no intent to do it and she doesn't think she did it. Mark? Good morning. Judge Loken, I would like to address some of your questions at the outset in the record. The issue about whether the company accommodated her restrictions, there's no dispute in this case she had a disability, a pulmonary condition, and she had a lot of restrictions that applied to that. In the record on Joint Appendix 177 is our undisputed statement of facts, and it says that the company fully accommodated her work schedule restrictions, as well as the obligation to provide a clean environment. Likewise, the company fully accommodated her need to attend medical appointments, as well as her need to miss work due to flare-ups of her condition. In response to that, the plaintiff qualifiably admitted it and said the defendant fully accommodated her work restrictions, her need to attend medical appointments, as well as her need to miss work due to flare-ups. There's no evidence in the record that she was ever disciplined, treated adversely, whenever she requested and needed time off work for her pulmonary condition, whether it was medical appointments or because she had a sickness on a particular day. The other issue I want to point out... ...would necessarily mean in this workplace no points being assessed under the attendance policy. That's right, Judge, and there is a chart in the record relating to her attendance record that starts at Joint Appendix 58, and it's actually on 57 it starts, but it's her record of attendance violations. You'll see all of her absences, the ones that were protected under FMLA, zero points. There were also some absences that were edited and changed to zero points because she was able to bring in a medical note to justify her absence. So there's nothing in the record that suggests, and there's no testimony or anything, indicating that the plaintiff was ever treated adversely for needing an accommodation in that regard. The issue on this appeal, Judge, really relates to her termination and the decision to terminate her, and when she was terminated on November 4th, she had missed work on October 30th. And from the company's standpoint, you have to evaluate, which I believe you indicated, Judge Loken, when you look at the company's decision to terminate, you evaluate it at the time it was made. And there is absolutely no evidence in the record that suggests, when the company made the decision to terminate her, that they had any evidence that she was requesting an accommodation or there was any kind of flare-up issue on October 30th. The only evidence in the record that even supports that medical evidence is a doctor's note from February of 2014, three months after she was fired, which was 2015. I apologize. She was terminated on November 4th, 2014. That note was never given to the company. The note in November that she refers to was never given to the company. And there's no evidence the company ever got it until this litigation started. So there was never any medical evidence presented to support her absence on that October 30th date. The case law says, Judge, that the Eighth Circuit case says that when you look at the employer's decision and they have to prove pretext to overcome our legitimate reason, they have to show that the company acted with an intent to discriminate, not merely that the reason stated by the employer was incorrect. So when you look at the company's decision to terminate, which happened on November 4th, when she got... It seems to me that when the decision was made, in other words, before or at the end of that meeting, is disputed. I don't believe it is, Judge. I think in the record it shows that the term came... It is in the briefs. Well, if you look at their response in the Joint Appendix 187 to our statement of facts, we state that plaintiff was issued the paperwork on November 4th terminating her employment, and that was also when she informed that the company concluded she violated the last chance agreement with her absence. They qualifiably admitted that on 187, and they say that Ms. Slepp may have informed that she violated the last chance agreement by calling in for vacation at the beginning of that meeting. And then later the conversation turned to her flare-up. So she has admitted that that was communicated to her at the beginning of the meeting. And where the record is important is on the vacation admission. Let me pursue that. It seems to me if the accommodation history with an employee was, as you said, changing after the fact from points assessed to no points assessed because she brought in a note that was consistent with her longstanding accommodation for flare-ups, then when she comes in on November 4th, whether or not she had said vacation in the phone call, when she comes in and says this was a flare-up, then an accommodating employer, even if the termination papers had been prepared, would step back and consider whether, given the history of accommodating, this should be taken into account and perhaps reconsidered. What's wrong with that? And in which case doesn't that pass summary judgment in serious doubt? I don't think it does, Judge, and I'll tell you why. I think the employer has the right to dictate what is required, to excuse an absence for medical reason or to request an accommodation from the company. In this case, the policy is very clear. It says if you're going to try to come in and get a medical absence excused. But the policy had been read the way you want it read. The policy had been forgiven or overlooked for two years. I don't believe there's any evidence that it was. I think the policy is ambiguous, but you, apparently, Cargill doesn't. I mean, I'm just reading it. Cargill is living it. They say, no, coming in with a note after the fact doesn't excuse an unplanned absence. All right, but she had an accommodation, whether written or whether formal or informal, that she would be forgiven points if she had a flare-up at a doctor's note after the fact, consistent with her work restriction. Now, that trumps the policy, unless for some reason the Glass-Clair-Chance agreement trumped the accommodation practice. Judge, I think the two things I want to point out is, first of all, the policy says that if you're going to get a medical note, you've got to bring it in on the day you come back to work. She didn't do that. That's what the policy clearly says. And there may be some ambiguities in the policy, but what matters is how the company enforced it and whether it was consistently enforced against her. And if a policy is ambiguous and the company doesn't enforce it adversely against a disabled employee, there's no violation of law with respect to that. Well, wait a minute. If it's part of an accommodation required by ADA, don't say that too assertively. Well, and I understand what you're saying. And I guess in this case, if she was going to establish that she needed that day off due to a flare-up, she had to provide a medical note under the policy. And that's the way the policy had been consistently enforced by the company. She understood that. She admitted that. She acknowledged that in this case. And she never did. I thought we just established this morning that the record is strangely absent about how this was handled in 2013. I think the record does address how the company handled that. And there was an affidavit, or there was some testimony offered by Karen Richards. And the way the policy was enforced, let me find that reference for you, is under the company's point system, you call in, you push a button, and that tells you what the absence is. The company is not going to assess your point if it's FMLA, if it's a protected leave or an approved leave. If you push the button and it's a reason for the company to give you a point, they're going to give you that point. In order to remove that point, you've got to come in and bring in some kind of verification to excuse it. That's the way the policy was applied. And that's the way the policy is generally interpreted to be by the company. There was testimony by Karen Richards, and she stated in her deposition that basically what they do is they print off this call-in log every day, and it lists the reasons for the call-ins. And then employees are charged a point for those call-ins unless they come in with a doctor's note or something else to verify, and then they go back and correct it if that happens. That's the procedure. That's the practice. That's the way it's always been done. And that's the way... That's not in the policy itself. It's Karen Richards' testimony. It's on Joint Appendix 221. And so that's the way it was applied. So when she came in after she missed that day off, and, Judge, the record with respect to the vacation and what she requested on October 30th, I think it is clear in the record what happened on that day. She pushed the vacation button. She asked for a personal day. In our Joint Appendix 184, our Statement of Facts says that when she called in to report her absence on October 30th, she reported the reason for her absence as vacation. Their response to that on the following page, Joint Appendix 185, says that on October 30th, Ms. Lip called in to report her absence from work just as the defendant states. And then she goes on to say... What's the record evidence on she pushed the call-in vacation button? Joint Appendix 185. Is this documentary or is this just some... It's in their answers and it's in her testimony. And it's also in their response to our Statement of Facts where they say that Ms. Lip supposes it's possible she keyed the wrong button, but she never intended to use vacation time. So she says... She doesn't say I pushed... Wait, wait, wait. Sure. This is all after the fact. I thought before the termination papers were prepared because she pushed the vacation button. That's correct. Now what's the evidence supporting that? She called in and she pushed the vacation button. What's the evidence supporting the button she pushed? I looked at the buttons that morning and they're all erased, but I remember that? Or is it... No, we have documentary evidence of a record. We submitted three affidavits. We submitted deposition testimony. And we submitted her statement that says she believes that she may very well have pushed the vacation button when she... Are the buttons pushed? Is that recorded? It's recorded on a phone system. And why isn't that in the record evidence? The record evidence is people testifying that that's why she was fired, because she pushed the vacation button. Does anyone ask whether the record exists? I believe we produced the call-in information in the course of this case. It's not in the record on appeal. What's in the record on appeal are people's statements saying that's the button she pushed and that's what our records reflect. And there was never any objection to that, Judge. That was admitted into evidence and was accepted by the trial court for purposes of this motion in this case. Counsel, with regard to the failure to accommodate claim, I'd like to have you address what it takes in this circuit for an employee to make an accommodation request and whether the standard is different under the Kratzer case that you cite in your brief and the Cowitz case. Judge, that's a good question. And in this case, I think the facts that apply to your question are she did have restrictions that said she's going to need to have medical appointments, and she did have restrictions that said occasionally her condition will flare up and she may need to be absent from work. And, again, the record is clear that the company always accommodated that. But in order to request an accommodation, I think the law is that you have to follow what the company requires to do that. And you have to put the company on notice that you're taking a day off work as an accommodation or you're requesting that as an accommodation. You can't just have a standing thing that says I'm going to need to miss work during flare-ups and then call in and report it as something else. But under Cowitz, don't you just have to inform the employer of enough information so that they can be said to understand the need for the accommodation? I think that is correct, that you have to put the employer on notice and them having knowledge that that's what you're asking for. And is that different than the standard in the Kratzer case that you cite in your brief? I don't believe it is. I don't think they're inconsistent with each other. I do not believe that. With respect to the accommodation argument, again, I think it goes back to the Eighth Circuit law that says when the decision is made to terminate, that's the timing you look at. Any request for accommodation came after the company made the decision to terminate, and that's what the district court found. And any request for an accommodation would have required her to produce a medical note to support that that was a day off she needed as an accommodation. And, again, we didn't get any medical notes. The medical notes were not given at all before this case was filed, and she never substantiated that, which is what the company requires under its policy and as a matter of practice. And she acknowledges that's what she was required to do, and she never did it. So for purposes of this case, we believe that when you look at the company's decision and if you look at the whole factual background of this case, this is not a company that defies logic and common sense to suggest this company discriminates against people because of a disability. I mean, they knew about her condition. They fully accommodated her. She admits that. They gave her FMLA leave. When she needed to care for her mother, they gave her nine months off work. And every one of those days was a point they could have used against her and fired her, and they didn't. They brought her back. They gave her a last chance agreement, one more chance. She missed another day of work within a week after that to go to a doctor's appointment. They didn't count a point against her and fire her at that point. This is a company... When was her next birthday? I think it would have been November 4th, I believe, but I'm not a positive. She told you're not coming into work, you're coming in for a meeting? No, not before she got there. So when she got there, my understanding is she met with her union representative and then she was taken into the meeting to be terminated at that point. Well, I'm just wondering if the practice was when you return to work, you've got to bring a doctor's note with you to get excused after the fact. Was she really returning to work or was she going back to be a member of the suspension? I think she was reporting back to work on her next day is my understanding of what it was. And when she did, that's when she was told that she was being terminated at that time. And she didn't have the medical note, which she clearly understood in her testimony. She acknowledged she understood that she needed a medical note to excuse absences for any medical reason. And the policy says you've got to bring it in on your day back. She didn't have it. She didn't produce it later. She never produced it until this case was filed. Thank you very much for your time. We would request the court to affirm the district court's decision on summary judgment. Thank you. You bet. Mr. Lyons, I took some of your time. I'm going to give you a couple minutes for rebuttal. Thank you, Judge. On the question of accommodation and when she asked for it, it was understood certainly no later than October 24th of 2012 that she had this incurable lung disease that she was going to need these periods of time off on an unpredictable basis. So that was the first request for an accommodation. And it was a standing request for an accommodation. And an accommodation that the employer does not suggest was anything other than a perfectly reasonable accommodation. They've said many times in many different ways in this case that they were very happy to provide that accommodation to her until November 4th when they did not provide that accommodation to her. The other thing on the subject of how she actually reported this vacation. Is that a case on sort of a continuing request for accommodation theory? The Cowitz case that Judge Grass referenced and discussed with Mr. Clark briefly states that really all that's required is for the employee to make it known that an accommodation is needed in some way. And she certainly did that from this very specific note from Dr. Berger. An awful lot happened between October 2012 and November 2014. Particularly the nine month leave unrelated to disability which is what triggered the last clear chance agreement. So this continuing request, it doesn't strike me as factually accurate. Maybe there's case law that says that's the way an employer is supposed to do things. And she certainly renewed that request as of the October 15th, 2014 when she's having this last chance meeting. They told her no more call wins, no more waits, no more leave earlies, nothing like that. And she says, now wait, I've got this doctor's appointment because of my incurable lung disease. And they permitted her that one appointment. But she's renewing in that meeting how is this last chance agreement going to fit in with my diagnosis and with my restrictions. And the answer in the end was not very well. Are you reciting testimony about that meeting on October 15th or just embellishing it? No. Ms. Perryman. Was there a discussion in addition to the doctor's appointment about what about flare ups and if so, where do I read the deposition testimony on both sides of that meeting? Well, Ms. Lipp certainly raised the concern about the appointment that she had with her doctor. And so the company was aware that she had this incurable lung disease and that she was going to require additional recommendation for that. The companies aren't people. There was a person at that meeting and there was a person involved in October 2012. Are they the same people? Is there any discussion of the history of accommodation in that October 15th meeting when she's given the last clear chance agreement, which kind of sets a new table, and she says, what about my appointment? And the employer says, okay, I understand. That's fine. And then what proceeds in the discussion? Anything in the record, in the summary judgment? No. Ms. Perryman had been her supervisor both before and after, and so she was aware. I mean, this is a company with a lot of employees, obviously, but she was specifically aware about this specific employee. She was the one at the meeting that approved it, so that's the transcript I read for what that discussion entailed. What Ms. Perryman said occurred in the meeting, right. Now, the only other thing that I would say is on the issue about the discovery issue with regard to what evidence was there that she called in for vacation, there was a recording that was produced in discovery. The recording, as you might imagine from a push-button system, is a series of beeps. So the recording doesn't actually tell you anything, and Ms. Richards said that they get a print-down of what those beeps are supposed to say. That apparently was not preserved because it was never part of the discovery in the case. And thank you for your attention this morning. Thank you, counsel. The cases have been thoroughly briefed and argued, and we'll take it under advisement.